IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Trudi M. Voltz,                                Case No. 3:13 CV 2606

                      Plaintiff,               MEMORANDUM OPINION
                                               AND ORDER
            -vs-
                                               JUDGE JACK ZOUHARY
Chrysler Group LLC – UAW Pension Plan,

                      Defendant.


## INTRODUCTION

Plaintiff Trudi Voltz ("Voltz") claims disability benefits through her former employer, Chrysler Group LLC ("Chrysler").  She based her 2011 benefits application on dermatitis, triggered, she says, by certain workplace chemicals.  Two reviewing physicians disagreed with the opinion of Voltz's personal physician, who viewed the dermatitis as a disabling condition.  On appeal from the Chrysler Group LLC – UAW Pension Plan's ("Plan") initial denial, a third physician found Voltz was not disabled because of her skin condition.  The Plan denied Voltz's appeal, and this lawsuit followed.

Both parties moved for judgment on the administrative record (Docs. 29 & 30).  Voltz claims the benefits denial was arbitrary and capricious due to various defects.  She also faults the Plan for not awarding her benefits because of possible mental illness, noted by the Chrysler-appointed physician as a basis for a disability finding.  The Plan argues the benefits denial followed pension plan requirements and rests on substantial evidence.  Both Motions are granted in part and denied in part.

## BACKGROUND

### The Parties

Voltz worked as an hourly union employee at the Perrysburg Chrysler Stamping Plant until June 2007.  Chrysler funds the Plan.[1]  The Board of Administration ("Board") is the Plan fiduciary, consisting of seven members: six split evenly between Corporation and Union appointees, and one tie-breaking "Impartial Chairman" appointed by the six other Board members (AR 48).  The Board has discretionary authority to (among other things) interpret the Plan Document (AR 49).  Sedgwick, a Board contractor, assists in processing pension benefit applications (Doc. 28 at 14).

### The Plan Document

A qualifying Chrysler employee may apply for Permanent and Total Disability Retirement ("PTDR") under the Plan Document.  If deemed eligible for PTDR, the employee receives monthly pension payments until age 65.  An eligible employee is "permanently and totally disabled" and "retires before age 65 with 10 years or more of credited service" (AR 14).  The Plan Document defines "permanently and totally disabled" (AR 15) (paragraph breaks omitted):

> An employee shall be deemed to be permanently and totally disabled only if he [or she] is not engaged in regular employment or occupation for remuneration or profit and the Board shall find, on the basis of medical evidence (a) that he [or she] has been totally disabled by bodily injury or disease so as to be prevented thereby from engaging in regular employment or occupation with the Corporation at the plant or plants where he [or she] has seniority for remuneration or profit, and (b) that his [or her] total disability will be permanent and continuous during the remainder of his life . . . .

A Corporation-appointed physician first examines the applicant to determine (1) if the employee is "totally disabled" (2) because of a condition that has "existed continuously for a period of at least five consecutive months," and (3) "[w]hether the employee's total disability will be

---

[1]  References to "the Plan" mean the Pension Plan, as an entity.  "The Plan Document" refers to the text of 2007 Pension Agreement, which governs Voltz's benefits eligibility (Doc. 26 at 2–90).

permanent and continuous during the remainder of []her life" (AR 16).  At its discretion, the Board may choose another physician to examine the applicant (AR 16).  "The medical opinions of such physician or physicians shall decide the question and shall be binding upon the [Board] which shall thereupon make its finding in accordance with such opinions" (AR 16).  If the reviewing physicians disagree, the question on which the physicians disagree "shall be submitted to a third physician appointed by such two physicians."  The third physician examines the applicant and consults with the other two physicians before issuing a tie-breaking opinion, which is "binding upon the Board" (AR 16).

### The 2008 Summary Plan Description

In 2008, the Plan adopted a Summary Plan Description ("SPD") (AR 123–83), a 60-page document which "summarizes the [Plan Document] and covers the highlights of the Plan details of greatest interest to" a covered Chrysler employee (AR 131).  The SPD cautions its reader that "[i]f there is a conflict between this summary and [the Plan Document] . . . , the Plan [D]ocument will govern" (AR 131).  The SPD defines "permanent and total disability" as a bodily injury or disease that renders an employee "unable to engage in any regular employment or occupation for pay or profit as a result of [the] disability, and the disability is expected to continue for the rest of [the employee's] life" (AR 139).  The Plan admits that the SPD's disability definition "is not identical to the language in the Plan," but denies Voltz's claim that the SPD's definition is "significantly more restrictive" than the Plan Document's definition (Doc. 28 at 7).

### Voltz Applies for PTDR

In June 2011, Voltz settled a prior lawsuit against Chrysler, reinstating her employment for the limited purpose of applying for PTDR.  *See Voltz v. Chrysler LLC*, Case No. 3:09-cv-00895-JZ, Doc. 29 (July 28, 2011).  Voltz filed her PTDR application in September 2011 (AR 276), which

consisted of (1) a Physician's Statement form (a standard form supplied by Sedgwick) (AR 158) and (2) Voltz's supporting medical records. Voltz's physician, Dr. M.F. Patel ("Patel"), opined that Voltz was PTD because of contact dermatitis (AR 614).

On September 22, 2011, Chrysler Plant Physician Dr. Sue Parkins ("Parkins") reviewed Voltz's application (AR 292). She too filed a Physician's Statement, stating Voltz was not permanently and totally disabled on the basis of contact dermatitis (AR 289–91). She concluded that Voltz's contact dermatitis was "likely to respond to known treatment," specifically noting there was little (if any) of the irritating chemicals (colophony and thimerosal) present in the plant (AR 290). She advised that Voltz "[a]void metal working fluids or compounds containing colophony" (AR 290). "Per [Voltz's] treating physician and specialist," Parkins noted, "her skin is clear due to avoidance" of the chemical. "Placement is possible with complete avoidance of the identified irritant" (AR 290).

Though she had the option to personally examine Voltz, Parkins only reviewed Voltz's medical records and plant information. The relevant Plan Document provision states that the applicant "shall be required to submit to an examination by a physician who shall have been appointed for this purpose by the Corporation for his [or her] medical opinion" (AR 16). A Plan employee advised Parkins "we are planning to do a record review in place of the plant exam" and Parkins agreed (AR 279). Parkins explained Voltz's "exam was waived because her behavior has been disruptive and unpredictable, has had inappropriate focus, and it appears that she has a very distorted perception of my role and recommendations" (AR 292). *See Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005) (counting as a relevant factor under arbitrary-and-capricious review the fact that, as here, a pension plan retains discretion to examine an applicant but instead opts for a file review).

Parkins' Physician Statement focused only on Voltz's skin condition. The Plant Notes, records of Plant medical staff of their encounters with Voltz stretching back to 1996, also explain why

4

contact dermatitis could not support a PTD finding.  But that is not all Parkins discussed.  On September 22, 2011, Parkins wrote in the Plant Notes (AR 292):

> While she is not PTD for her skin concerns, it is my medical opinion based on many interactions with her and the reports of others, including her last known mental health care provider, Dr. Gregory Forgac, as well as the current documentation provided by her, that she is PTD for psychiatric illness.  She has displayed paranoid ideations and hallucinations as well as poor insight and reality testing, without improvement.  Her exam was waived because her behavior has been disruptive and unpredictable, has had inappropriate focus, and it appears that she has a very distorted perception of my role and recommendations.

In a Plant Note entry the following day, Parkins reaffirmed her contact dermatitis conclusions, also noting Voltz "certainly should seek care and treatment for her psychiatric condition and seekd [sic] disability for the psychiatric illness rather than dermatitis" (AR 292).  So far as the administrative record reveals, Voltz has never been under the regular care of a mental health professional or diagnosed with a specific form of mental illness, and no party submitted materials from Dr. Forgac

Because Patel and Parkins disagreed that Voltz's contact dermatitis entitled her to PTDR benefits (AR 200), Sedgwick appointed Dr. Harvey Popovich ("Popovich") to examine Voltz (AR 389).  In Plan Document parlance, Popovich provided the "independent medical examination" (AR 200).  Prior to the examination, Sedgwick provided Popovich with a case summary, describing Voltz's medical background and transmitting relevant medical records (AR 282–86).  The case summary concluded with Popovich's assignment (AR 285) (second emphasis added):

> We ask that you review the medical [sic] and examine this individual for the permanence of her disabilities.  A reminder the definition of permanent total disability [sic] means the employee is disabled from regular employment or occupation with Chrysler *and* the disability is permanent and continuous during the remainder of his/her life, which means they could not do any type of work even outside of Chrysler. *The employee could never be able to work at any job for the rest of their life*.

5

In his October 18, 2011 Report, Popovich explained Voltz's "[p]hysical examination reveals a well-developed, well-nourished, alert female in no acute distress . . . . Her speech is clear and coherent[, but s]he has difficulty answering questions directly" (AR 392). He further noted (AR 392):

> In response to your specific question, it is my independent medical opinion that Ms. Voltz is not permanently and totally disabled from all employment activities. Ms. Voltz is capable of traveling to and from a place of employment by either public or private transportation. She is capable of remaining at a place of employment for eight hours a day or more and of performing gainful employment activities with the restriction that she not have exposure to colophony, abietic acid, or thimerosal. Her examination does not reveal evidence of functional impairment with respect to her upper extremities, her lower extremities, her spine or her cardiovascular system.

**The Board Denies Voltz's Application and Appeal**

In November 2011, the Board denied Voltz's PTDR application ("the initial denial letter"), finding Voltz not disabled on the basis of contact dermatitis (AR 200). The initial denial letter recounted PTD eligibility requirements, noted the disagreement between Patel and Parkins resulted in referral to Popovich, and explained the basis for the benefits denial:

> You had an independent medical evaluation on October 18, 2011. As a result of your examination, the examining physician, Dr. Harvey Popovich, indicated that your condition does not appear to be permanently and totally disabling for the remainder of your lifetime.

> On the basis of the medical evidence submitted, it has been determined that you are not permanently and totally disabled as is required[] under Section (8) of the Pension Plan. Therefore, you are not eligible for a PTD retirement and your application must denied.

Voltz timely appealed the denial (AR 188–91). Sedgwick appointed Dr. Siva Ayyar ("Ayyar") to review Voltz's application and the medical records (Doc. 28 at 22–23). Ayyar's January 18, 2012 Report noted that in 2007 a plant physician "indicated the company was able to accommodate restrictions of no exposure to coolant," a trigger of Voltz's dermatitis (AR 268). "While Ms. Voltz

6

may need an environmental restriction to keep her exposure to the offending substance to a minimum, she is certainly not totally and permanently disabled for the remainder of her lifetime" (AR 268).

In January 2012, the Board denied Voltz's appeal ("the appeal denial letter") (AR 270–71). The appeal denial letter noted the Plan Document's PTD definition, Popovich's earlier PTD conclusion, and Ayyar's file review. Ayyar, "[t]he specialist in Occupational Medicine[,] noted that you have a diagnosis of contact dermatitis." The Board explained the skin condition likely was "irritant contact dermatitis," not "allergic contact dermatitis." The Board's analysis of Voltz's condition concluded (AR 271) :

> It is reported, however, that you have exhibited recurrent rashes following exposure to colophony, which is present as a component of grease and lubricant, which are used in various machine oils. There was some question of you having exhibiting [sic] a rash following inhalation exposure to colophony fumes; this is less clearly established. Typically reactions through rosin and oil occur through skin rather than through inhalation. However, you are not totally and permanently disabled for the remainder of your lifetime.

Left unmentioned by the Plan at any point during the PTDR review was Voltz's February 2010 Social Security Administration ("SSA") award for disability benefits based on Voltz's dermatitis (AR 420–21). Popovich received a copy of the SSA decision awarding benefits (AR 286), and Ayyar noted the decision in his Report (AR 267).

### STANDARD OF REVIEW

In reviewing a denial of benefits under 29 U.S.C. § 1132(a)(1)(B), a district court must "conduct its review based solely upon the administrative record." *Cooper v. Life Ins. Co. of N. Amer.*, 486 F.3d 157, 171 (6th Cir. 2007) (quotation marks omitted). This Court reviews the Board's decision under an arbitrary and capricious standard. *See Borda v. Hardy, Lewis, Pollard & Page, P.C.*, 138 F.3d 1062, 1066 (6th Cir. 1998).

This standard is "the least demanding form of judicial review of administrative action." *Abbott v. Pipefitters Local Union No. 522*, 94 F.3d 236, 240 (6th Cir. 1996). An outcome is not arbitrary and capricious if supported by a reasonable explanation, based on substantial evidence. *Id.* But, "[d]eferential review is not no review, and deference need not be abject." *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003) (quotation marks omitted). Review of the Plan's decision requires an examination of the quantity and quality of medical evidence relied on by the Plan and submitted by Voltz. *Id.* at 171. This Court "will uphold the [Plan's] decision 'if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" *Elliot v. Metro. Life Ins. Co.*, 473 F.3d 613, 617 (6th Cir. 2006) (quoting *Glenn v. Metlife*, 461 F.3d 660, 666 (6th Cir. 2006)).

When this Court assesses the quality of the Board's reasoning, or the amount of evidence supporting that opinion, it must focus on the the Plan's stated basis for the denial. "[T]he court's role is to review the basis for the decision *that was actually made by the plan administrator*, not to provide an adequate basis where none was offered." *Glenn*, 461 F.3d at 672 (emphasis added). *Cf. Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 712 (6th Cir. 2000) ("The deferential standard of review of a plan interpretation is appropriate only when the trust instrument allows the trustee to interpret the instrument *and when the trustee has in fact interpreted the instrument*.") (emphasis in original) (quotation marks omitted).

## DISCUSSION

### Voltz's Evidence

Voltz submitted evidence that workplace chemicals triggered her severe skin rashes. That evidence includes repeated Plant Note references to on-the-job inflammation (*e.g.*, AR 213, 215). The record also includes Dr. Ronald Negrich's June 2007 notes. Negrich, a specialist in allergy and

8

asthma care, ordered Voltz to undergo Patch tests after learning from Voltz how her skin became inflamed (AR 327–28). The same month, Negrich interpreted Patch test results, noting a strong reaction to colophony and a positive reaction to thimersol (AR 221–24, 335).

Then, in September 2007, Dr. Lois Nelson examined Voltz. Voltz told Nelson there were two Plant positions that would not expose her to colophony or thimersol, but that all Plant jobs were filled by rotation. Therefore, she would have to rotate through positions that included risk of exposure to irritants. For those jobs with a risk of irritant exposure, Dr. Nelson opined that Voltz was "100% disabled" (AR 283, 339–41).

In October 2007, Voltz saw Dr. Eric Schaub, an occupational medicine specialist. Schaub interpreted the Negrich Patch test results. He agreed with Negrich that Voltz showed a reaction to colophony, but doubted the thimersol reaction was a "clinically significant positive test." He stated it would be reasonable to believe that Voltz would be exposed to these chemicals at the Plant (AR 345–46). Schaub referred Volz to a dermatologist, Dr. Earl Rudner, for more extensive Patch testing (AR 349). Rudner applied 100 patches from different trays, noting a reaction to colophony and thimersol (AR 351–52, 354–58, 360–61).

No physician expressly found Voltz's description of her symptoms to be non-credible. Voltz claimed that in 2011, four years after leaving Chrysler, she had a "constant rash which is variable in its intensity and distribution" (AR 391). The rash "itches and burns and reaches a discomfort level of 9.5 on a scale from 0 to 10 " (AR 392).

9

**The Initial Denial**

The substantive basis for the Plan's initial denial reads in full:

> You had an independent medical evaluation on October 18, 2011. As a result of your examination, the examining physician, Dr. Harvey Popovich, indicated that your condition does not appear to be permanently and totally disabling for the remainder of your lifetime.

The Plan's initial denial depends entirely on Popovich's Report, consistent with the Plan Document requirement in cases where a "third" doctor is appointed to review a PTDR application: "The medical opinion of such third physician, after examining the employee and consulting with such other two physicians, shall decide the question and shall be binding upon the Board . . . which shall thereupon make its findings in accordance with such opinion" (AR 16). Because Popovich's medical opinion is fatally flawed, the initial denial was not a reasoned decision that rests on substantial evidence.

Despite the Plan Document's plain language, there is no evidence that Popovich "consult[ed] with" either Patel or Parkins. Sedgwick also instructed Popovich to evaluate Voltz's condition under a significantly more stringent PTD definition than appears in the Plan Document. Voltz is entitled to PTDR benefits if (among other things) the medical evidence shows her disability prevented her from "engag[ing] in regular employment or occupation with the Corporation at the plant or plants where [s]he has seniority for remuneration or profit" (AR 15). Popovich was told to examine whether Voltz "could never be able to work at *any* job for the rest of [her] life," even "*outside* of Chrysler" (AR 285) (emphases added).

Following Sedgwick's definition, Popovich concluded Voltz "is not permanently and totally disabled from *all* employment activities" (AR 392) (emphasis added). He notes the unremarkable facts -- not challenged by Voltz or any other doctor -- that she can "travel[] to and from a place of

10

employment by either public or private transportation," and remain at "a place of employment" for eight hours each day.  He qualifies his opinions about Voltz's ability to travel to and remain at "a place of employment" with the requirement that she "not have exposure" to various substances.  But he never engages in an analysis of irritant exposure at relevant Chrysler Plants or references documents that do.  Popovich opines that Voltz would not be disabled if she avoided the trigger for her contact dermatitis.  But he never assessed whether she *can* avoid triggering chemicals.  "[W]here a reviewing physician's opinion applies standards that conflict with the terms of the plan, that opinion is not evidence supporting a conclusion that the claimant is not disabled within the meaning of the plan."  *Hayden v. Martin Marietta Materials, Inc. Flexible Benefits Program*, 736 F.3d 598, 607 (6th Cir. 2014).  *See also McDonald*, 347 F.3d at 172.

The Plan argues that Popovich's application of the wrong definition does not matter: Popovich only renders medical opinions; those medical opinions bind the Board, but they do not limit the Board's discretion to determine "whether the employee met the definition of permanent total disability" (Doc. 33 at 6) (quotation marks omitted).  The Plan stresses that it cited the correct PTD definition in the initial denial letter, and medical evidence could support the Board's PTD decision (Doc. 31 at 6 ("The [Board] considered [Popovich and Ayyar's Reports], in conjunction with other information included in the administrative record, including [Parkins'] report and the Work Assessment, to make its determination.")).

"Logically, [the Board] could have made a reasoned judgment only if it relied on medical evidence that assessed [Voltz's] physical ability to perform job-related tasks" in the positions that matter for purposes of PTDR benefits: positions in relevant Chrysler plants.  *Elliott*, 473 F.3d at 618.  Popovich's opinion is not that type of medical evidence, and the Board cited no other evidence when it explained the initial denial to Voltz.  This Court reviews the Plan's actual, articulated basis for

11

denying Voltz's application, not some alternative basis articulated only in the Plan's pleadings.  *See Gorski v. ITT Long Term Disability Plan for Salaried Employees*, 314 F. App'x 540, 548 (4th Cir. 2008).  The Plan's initial denial was not a reasoned decision.

### The Appeal Denial

However, the Board's appeal denial letter provided an adequate basis for denying Voltz's PTDR application on the basis of her skin condition.  The appeal denial letter relied entirely on Ayyar's Report.  Ayyar's Report provided a reasoned explanation for why Voltz's skin condition was irritant contact dermatitis.  He then noted alternative possible triggers for the rash (*e.g.*, Voltz's pet dog and her smoking habit) but found that "[i]n this case . . . the prominent occupational exposure to machine oil, coupled with the positive skin test, suggests colophony is the offending irritant substance" (AR 268).  Having identified the "offending irritant substance," Ayyar immediately states "[n]evertheless, Ms. Voltz is not totally and permanently disabled for the remainder for [sic] her lifetime.  She can perform other forms of work which do not involve such exposure.  While Ms. Voltz may need an environmental restriction to keep her exposure to the offending substance to a minimum, she is certainly not" PTD (AR 268).

While the Ayyar Report's "rationale" section does not contain an express finding that positions exist in relevant Chrysler plants that would fit Voltz's environmental restriction, Ayyar cites information which says as much (AR 482 (noting Parkins' opinion that positions within the Plant would not expose Voltz to chemicals that triggered Voltz's skin condition)).  Further, there is no evidence that Ayyar applied an incorrect PTD definition.

Ayyar's medical opinion is based solely on a file review, a fact that bears on whether the Plan's denial on appeal was arbitrary and capricious.  *Kalish v. Liberty Mutual/Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 508 (6th Cir. 2005).  Moreover, the Plan may rely on a file-review doctor's

12

opinion and discount the opinion of a treating physician, but it must explain why it chose to resolve disputing medical opinions as it did. *Elliot*, 473 F.3d at 620 ("Generally speaking, a plan may not reject summarily the opinions of a treating physician, but must instead give reasons for adopting an alternative opinion."). *Cf. Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Even considering the nature of Ayyar's review, this Court concludes the appeal denial letter is a reasoned decision, which rests on substantial evidence.

Directing further consideration of Voltz's PTDR application on the basis of her skin condition, because either Ayyar or the Board failed to expressly reference the "dry positions" in various departments (AR 291), would be a "useless formality." *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 660 (6th Cir. 2013). There is no objective record evidence that Chrysler *cannot* accommodate Voltz's skin condition, and Voltz's own physician states that her skin condition improves without exposure. Remand would only result in the Plan inserting another sentence in the denial letters, making explicit its reliance on uncontradicted record evidence that demonstrates an environmental restriction is feasible.

### Additional Considerations -- Social Security Disability Determination

Both the initial and appeal denial letters omit any mention of Voltz's favorable SSA disability determination. The administrative law judge found Voltz's statements about her dermatitis credible, and that Voltz's dermatitis caused her to have "extensive skin lesions that persist for at least 3 months despite continuing treatment as prescribed," producing "very serious limitations" in Voltz's day-to-day functioning (AR 424). "That [the Plan] . . . failed to consider the Social Security Administration's finding of disability in reaching its own determination of disability does not render the decision arbitrary *per se*, but it is obviously a significant factor to be considered upon review." *Glenn*, 461 F.3d at 669.

Ayyar noted (but did not analyze) the SSA disability finding.  Considering the purpose of Ayyar's review, he chose an odd way to describe the decision.  In the rote recitation of medical records that accounts for roughly half of his Report, Ayyar only refers to the SSA decision as "[a] Social Security Administration operative adjudication and review, in which it is noted that Ms. Voltz does qualify as the unmarried widow of a deceased insured worker beyond the age of 50, who meets the non-disability requirements of the Social Security Act" (AR 267).

Of course, in his first "finding of fact and conclusion of law," the administrative law judge did reach that conclusion.  Ayyar omits mention of any of the other five findings of fact or conclusions of law, including that Voltz had "[e]xtensive skin lesions . . . that involve multiple body sites or critical areas, and result in very serious limitation" of (for example) Voltz's ability to engage in fine and gross motor skills (AR 424).  One would think that a doctor reviewing the severity of Voltz's contact dermatitis would at least mention these latter findings of fact, not just "non-disability" factors irrelevant to his inquiry.

### Additional Considerations -- Popovich's Improper Appointment

Under the Plan Document, when the "first" and "second" doctors to review a benefits application disagree as to whether the applicant is eligible for benefits, "that question shall be submitted to a third physician appointed by such two physicians" (AR 16).  As the Plan explained to Voltz, Popovich was the "third" doctor (AR 200).  The Plan does not dispute that someone other than Patel and Parkins appointed Popovich -- "the Board . . . appointed Dr. Popovich, utilizing the services of Sedgwick to retain him" (Doc. 33 at 5 n.2).  More specifically, the Plan's case notes reveal "NIMEN-Occupational Medicine" selected Popovich (AR 276). *See also* AR 279.  This appointment error is one factor in considering whether the benefits denial was arbitrary and capricious.

14

**The Benefits Denial was not Arbitrary and Capricious**

"[T]he ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002).  The process that resulted in the appeal denial letter was not error free.  Popovich was improperly appointed.  His medical opinion is fundamentally flawed because it applies a too-stringent PTD definition.  But the appeals denial letter rests on substantial evidence that (1) Voltz has irritant contact dermatitis, not allergic dermatitis; (2) Voltz's dermatitis is triggered by chemicals found in relevant Chrysler plants; (3) not all positions at relevant Chrysler plants involve exposure to these irritating chemicals; and (4) when Voltz is not exposed to the irritating chemicals, her skin condition is manageable.  Additional considerations do not detract from that conclusion.  Defects in initial consideration of Voltz's application "w[ere] rectified upon [further administrative] review." *Judge*, 710 F.3d at 659.  The decision to deny benefits was not arbitrary and capricious.

**Voltz's Possible Mental Illness**

Voltz applied for PTDR benefits on the basis of dermatitis (AR 228–29), appealed the initial denial on that basis (AR 188–91), and the Board twice rejected her claims on that basis.  During administrative proceedings, Voltz was not told of Parkins' Plant Note comments, stating Parkins believed Voltz was permanently and totally disabled on the basis of mental illness.  Voltz argues the Plant Note findings amount to a PTD finding.  As a result, her application should have been granted because Patel and Parkins agreed Voltz was PTD, though on the basis of different medical conditions.  The Board argues it need only evaluate Voltz's application on the basis of conditions identified in the application.  It argues that because Voltz focused the Plan's attention only on her dermatitis, the Plan need not evaluate Voltz's eligibility on any other basis.

15

Relevant plan provisions require the employee to "prepare a written statement which . . . provide[s] all facts and circumstances concerning" the employee's benefits application (AR 47–48). The SPD informs the employee that the Application "begins when you request" a Physician Statement from Sedgwick (AR 158).  Though not reflected in any Plan Document or in the SPD, Sedgwick apparently distributes one form to employees who claim disability on the basis of a physical condition, and another form to employees who claim disability on the basis of a mental condition (*see* AR 277).  In the ordinary case, then, the employee frames his or her PTD application by selecting the appropriate Physician Statement forms, and the Plan can reasonably rely on that initial framing to assess PTD eligibility.

This is not the ordinary case.  Rather, substantial evidence suggests Voltz is mentally ill; that before and during administrative proceedings she failed to appreciate her possible mental illness; and that Chrysler and the Plan were aware of this possible mental illness.  In these circumstances, the Plan's narrow focus on Voltz's declared disabling condition (dermatitis) amounts to an unreasonable application of Plan Document language.

Since at least 2002, Chrysler employees have recorded dozens of instances of Voltz's disturbing behavior, indicative of mental illness.  The Plant Notes recount this behavior in some detail.

In September 2002, Voltz complained that "everyone [at the Perrsyburg Stamping Plant] is talking about her" (AR 309).  Two months later, Voltz complained about a "conspiracy at her job site," and that she "had these feelings before in the past."  Voltz said "she feels like she is loosing (sic) her mind," and felt scared that a local radio broadcast and a CNN television show sounded "like [they] w[ere] aimed at her" (AR 308–09).  A Chrysler employee reported that Voltz "appear[ed] to have

16

auditory hallucinations and paranoid symptoms," "acute paranoid delusion," and "depression" (AR 308).

In May 2006, a Chrysler employee spoke with Voltz about her "unusual and bizarre behavior." Voltz denied hallucinations, but "displayed some flight of ideas."  She referenced "chill pills and her unwillingness to take them" (AR 305) (quotation marks omitted).  The next month, Voltz again displayed "paranoid behavior," "stat[ing] that people lie and are gossiping" about her (AR 305).  More allegations of a plant conspiracy followed in July 2006 (AR 304).  Voltz displayed "manicky [and] precipitous responses and tangential thinking" in September 2006 (AR 304).

Voltz's outbursts became more disturbing and more frequent in the final year of her employment with Chrysler.  In December 2006, Voltz appeared to be "becoming more delusional again" (AR 302).  In April 2007, Voltz "called through security today . . . telling [a Patrick Skinner I] need to hurry [and] find a closed circuit T.V. and watch Mark Everson with the Internal Revenue Service" (AR 300–01).

Parkins held a telephone consult with a Dr. Bartlett in May 2007, "discuss[ing] our increasing concern about [Voltz's] progressively more bizarre and disruptive behavior."  Parkins would "attempt to facilitate [Voltz] entering into a treating relationship with a behavioral therpist," but noted Voltz "historically had very poor insight" into her own mental condition (AR 300).  Seven Plant Note entries followed in May 2007, all but one painting a distressing picture of Voltz's mental state.  Voltz repeated her claims about Plant conspiracies, adding claims that various Plant employees were "sleeping together"; discussed a new conspiracy between a Plant employee and an Ohio Bureau of Workers' Compensation employee; alleged bizarre acts of sexual harassment by Plant employees; claimed Plant employees "accussed [her] of brin[ging] pee into the plant in a bottle" and told her to

"take her clothes off"; stated another employee gave her scabies; and accused a former plant

supervisor of stalking (AR 298–300).

The Chrysler medical staff's concern is palpable.  At month's end a staffer noted (AR :

> We have been struggling with her behavior, feeling that she is nearing the point that
> she will have to be removed from the workplace because she is so disruptive, and are
> starting to feel concerned that her paranoia may reach a more volatile level.  She did
> not seem explosive yesterday, but I am concerned that there is a deterioration in her
> thought processes and strongly feel she needs treatment.  This will be the second time
> I will be involved in that process which she is likely to interpret as being based on her
> elusive rash or as retribution for some imagined workplace transgression, symptomatic
> of her lack of insight.

On June 6, 2007, Voltz complained about "semen on a baby."  Plant medical staff also learned,

apparently for the first time, that two weeks before Voltz "scream[ed] in the break room that everyone

there was the reason she is loosing [sic] her house" (AR 297–98).  Plant medical staff removed Voltz

from work because of these outbursts (AR 298).

Voltz continued to place "[a]dditional bizarre phone calls" to Plant staff after her termination,

which she apparently interpreted as a "cover up" of her dermatitis.  Again and again, Plant staff note

Voltz failed to understand or acknowledge her likely mental illness (AR 293–97).

It is therefore not surprising that Voltz failed to apply for PTDR benefits on the basis of her

mental condition.  Yet, the Plan initially expected Voltz to apply for mental health-related PTDR

benefits (AR 277) (Plan "notes related to Ms. Voltz's PTD Application" (AR 275) explaining Plan

employee's "understanding that in this case [Voltz's former] attorney was to be working on getting

a PTD [employee Physician Statement] from [Voltz's] psychiatrist" but that, when contacted, Voltz's

former attorney "did not seem to know anything about getting the" mental health Physician

Statement).  On September 12, 2011, Voltz contacted a Plan employee, asking about her PTDR

application's status.  The Plan employee "mentioned I had been told there would be a [Physician

Statement] for [Mental Health.  Voltz] said there are no doctors that feel she is PTD for [mental health reasons].  She went on to talk continuously for at least 20 minutes about her case with Chrysler and why she was permanently disabled" (AR 278).

Of course, Voltz was correct in noting "no doctors . . . feel that she is PTD" for mental illness. But the Plan should not confuse the absence of a medical diagnosis of mental illness with the absence of mental illness.  So far as the record reveals, Voltz never consulted a physician or psychiatrist for the purpose of evaluating her mental condition, despite the repeated urging of Plant medical staff. Voltz's mental condition was apparent not because Voltz sought clinical help with paranoid thoughts or outbursts, but because she visited Plant medical staff to complain about unrelated physical ailments or thoughts which she apparently did not appreciate as paranoid delusions.  Voltz was unaware that, following many of her visits to Plant medical staff, staff recorded in the Plant Notes instances of possible psychosis.  And she did not know of Dr. Parkins' September 22 and 23, 2011 PTD conclusions, also recorded in the Plant Notes, until after exhausting all administrative remedies.

The Plan's insistence on limiting its PTD evaluation to Voltz's skin condition is unfair.  For one, the Plan claims it can shore up Popovich's fundamentally flawed opinion by pointing to other medical evidence on which neither Popovich nor the Plan relied.  At the same time, the Plan insists on assessing Voltz's PTDR application only as it was originally framed, ignoring strong record evidence that the person who filed that application may suffer from mental illness.

Nor is evidence of Voltz's possible mental illness "buried" in the Administrative Record. References to her condition are instead scattered throughout the Plant Notes in dozens of entries. Voltz's unstable condition is also common knowledge to Chrysler's Union Benefits Representative, Plant medical staff, and Plan employees.  Because Popovich and Ayyar received copies of the Plant Notes, they too had notice of Voltz's mental condition.  Voltz's mental instability, in fact, was the

19

very reason Chrysler removed her from work, and (on Parkins' understanding) was the basis for "waiving" Voltz's in-person exam by a company-appointed physician.

The Plan complains that if it must assess Voltz's application based on an unspecified mental condition, it must also assess Voltz' application to see if a "contusion of forehead" (suffered a decade ago) or "diarrhea" (experienced nine years ago) entitle her to benefits (Doc. 33 at 8).

This doomsday argument rings hollow in the context of this case. Voltz is not asking the Plan to consider whether she is disabled because of every possible ailment reflected in the administrative record. She is asking the Plan to consider her application based on a condition of which there is widespread knowledge among relevant actors, which served as the basis of her termination, and which record evidence strongly suggests Voltz did not understand at the time her application was filed and reviewed. Refusing to consider Voltz's request that her mental disability be assessed is unreasonable.

In other contexts, a mentally-ill litigant's procedural rights are shaped by the litigant's mental illness. To name just a few: mental illness can serve as "cause" to excuse the procedural default of claims raised for the first time in a federal habeas proceeding. *See Ata v. Scutt*, 662 F.3d 736, 742 (6th Cir. 2011). "A party's ability to cognitively appreciate the notice of an action imparted by service of process is presumed under the common law." But if "a party's mental condition is put in issue" by a lawsuit, the common-law service-of-process presumption does not necessarily apply and a court must determine whether the mentally-ill litigant appreciated he or she was the target of a lawsuit. *Vance v. Federal Nat. Mortg. Ass'n,* 988 P.2d 1275, 1280 (Okla. 1999). Under common law and statutory rules, courts will toll the limitations period for bringing an action during the time the plaintiff is of "unsound" mind. *See, e.g.*, *Lanning v. Brown*, 84 Ohio St. 385, 397 (1911). *See also* R.C § 2305.16. Mental illness can toll the limitations period for exhausting administrative remedies. *See, e.g.*, *Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000). And a litigant's mental illness weighs

20

against certain discovery sanctions, like entry of default. *See, e.g.*, *Roby v. Ctr. Cos.*, 1989 WL 107127, at *5 (6th Cir. 1989).

This Court cannot, on this record, predict whether Voltz is in fact mentally ill, much less that she is entitled to PTDR benefits based on such illness. The Plan, though, abuses its discretion by failing to consider her mental condition as a basis for PTDR benefits. Remand is appropriate to allow Voltz adequate process with respect to possible mental health-related disability. *Shelby County Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 373 (6th Cir. 2009).

### Voltz's Attorney Fees and Costs Request

Voltz also moves this Court for attorney fees and costs under 28 U.S.C. § 1132(g)(1).

> We utilize a five-factor test in assessing whether the district court properly exercised its discretion in awarding fees: (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions.

*First Trust Corp. v. Bryant*, 410 F.3d 842, 851 (6th Cir. 2005) (paragraph break and quotation marks omitted). First, "an arbitrary and capricious denial of benefits does not necessarily indicate culpability or bad faith." *Moon v. Unum Provident Corp.*, 461 F.3d 639, 643 (6th Cir. 2006) (brackets and quotations marks omitted). But, a plan administrator is "culpable where the administrator terminated benefits based primarily on the opinions of doctors employed by the company's own claim department." *Gaeth v. Hartford Life Ins. Co.*, 538 F.3d 524, 530 (6th Cir. 2008). Here, the Plan ignored the finding of a company doctor that Voltz was PTD, and the record belies the claim that mental-illness related evidence was overlooked because it was buried in the record.

Second, the Plan can pay a reasonable attorney fee award.  Third, a fee award for Voltz's efforts in this case creates some deterrent effect: an award would encourage the Plan to better supervise its contract staff so that physicians apply the proper PTD definition, SSA disability findings are not ignored, the Plan provides reasons for relying on a file-review doctor's opinion over a treating physician's opinion, and the Plan and its agents abide by plain Plan Document language (*e.g.*, Popovich's consultation obligation and the proper appointment of an independent medical examiner). Fourth, "most of the participants in and beneficiaries of the [Plan] st[and] to gain nothing from this lawsuit." *Foltice v. Guardsman Products, Inc.*, 98 F.3d 933, 937 (6th Cir. 1996).  This Court's decision is highly fact-specific: a plan administrator abuses its discretion when it refuses to evaluate an applicant's benefits eligibility on the basis of a possible mental health condition, when the Plan has knowledge of the applicant's possible mental illness, the same mental illness served as the basis for the employee's termination, and the employee apparently lacked any insight into her possible mental illness until after the conclusion of administrative proceedings.  Finally, the Plan's position with respect to Voltz's dermatitis was sufficiently supported, and its position with respect to Voltz's mental illness, while ultimately unsuccessful, is not meritless. *Shelby County Health Care Corp*., 581 F.3d at 378. *See also  Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1304 (6th Cir. 1991).

Factors one through three weigh in favor of a fee award.  Factors four and five weigh against an award.  Balancing the factors together, this Court grants Voltz's request for attorney fees and costs.

### CONCLUSION

For the above reasons, Voltz's Motion for Judgment on the Administrative Record (Doc. 29) is granted in part and denied in part, and Defendant's Motion for Judgment on the Administrative Record (Doc. 30) is denied in part and granted in part. Voltz's Motion for Attorney Fees and Costs is granted.  Parties are instructed to meet and confer regarding the precise amount of attorney fees and

22

costs to be awarded before filing any further motions.  This matter is remanded to the Plan so that Voltz can apply for PTDR benefits on the basis of possible mental illness.

IT IS SO ORDERED.

    s/ Jack Zouhary
JACK ZOUHARY
U. S. DISTRICT JUDGE

October 22, 2014

23